**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK DEWAYNE BRITT, | No. C 06-2287 MHP (pr) |
| Petitioner, | |
| v. | |
| A.P. KANE, warden, | |
| Respondent / | |
| JACK DEWAYNE BRITT, | No. C 07-1121 MHP (pr) |
| Petitioner, | |
| v. | **ORDER DENYING HABEAS PETITIONS** |
| BEN CURRY, warden, | |
| Respondent. / | |

**INTRODUCTION**

Jack Dewayne Britt, an inmate formerly at the Correctional Training Facility in Soledad and now at Avenal State Prison, filed pro se actions seeking a writ of habeas corpus under 28 U.S.C. § 2254 to challenge a 2004 parole denial and a 2005 parole denial. Both matters are now before the court for consideration of the merits of the habeas petitions. For the reasons discussed below, the petitions will be denied.

**BACKGROUND**

Britt was convicted on a guilty plea in Stanislaus County Superior Court of second degree murder and attempted kidnapping. He was sentenced in 1985 to 17 years to life in prison.[1] His habeas petitions do not challenge his conviction but instead challenge decisions by panels of the Board of Prison Terms, now known as the Board of Parole Hearings

("BPH"), finding him not suitable for parole in 2004 and 2005.  Before he filed his federal petition concerning the 2004 BPH hearing (i.e., Case No. C 06-2287), another parole hearing was held in 2005 and he was found not suitable again.  Britt filed a new federal habeas petition challenging the 2005 decision (i.e., Case No. C 07-1121).   The court considers both petitions in a single order because they have many of the same facts and raise most of the same issues, although the court must consider separately each of the BPH decisions.

The court earlier indicated that it intended to wait for guidance from the anticipated en banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008), and further briefing thereafter.  Although much time has passed, Hayward remains pending in the appellate court and it is unknown to this court when the decision will be released.  The court will proceed to decide the merits of the petitions without the benefit of the Hayward decision.

A.     Case No. 06-2287 - The 2004 Parole Denial

In Case No. C 06-2287, Britt challenges the BPH's decision on May 17, 2004 finding him unsuitable for parole.  The BPH identified the circumstances of the commitment offense, Britt's escalating pattern of criminality, Britt's unstable social history, and Britt's failure to adequately engage in self-help programs as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to public safety.

Britt sought relief in the California courts.  The Stanislaus County Superior Court denied his petition for writ of habeas corpus in a one-paragraph order.  The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Britt then filed his federal petition for a writ of habeas corpus.  The two claims that remain for adjudication are the claims that (1) Britt's right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole and (2) the BPH's decision violated his plea agreement.

B.   Case No. C 07-1121 - The 2005 Parole Denial

In Case No. C 07-1121, Britt challenges the BPH's decision on December 12, 2005 finding him unsuitable for parole.  The BPH identified the circumstances of the commitment offense, Britt's unstable social history that included violence and drug use, and his record of prison misbehavior that included a recent write-up for attempted stealing as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to public safety.

Britt sought relief in the California courts.  The Stanislaus County Superior Court denied his petition for writ of habeas corpus in a one-paragraph order that apparently misunderstood his petition to be a second challenge to the 2004 decision.  The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Britt then filed his federal petition for a writ of habeas corpus.  The lone claim in the petition is that Britt's right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  These actions are in the proper venue because the challenged action concerns the execution of the sentence of a prisoner who (at the time he filed the petitions) was housed at a prison in Monterey County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims remaining for adjudication.

3

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.   Case No. C 06-2287  - The Challenge To The 2004 Parole Denial

   1.   Sufficiency Of Evidence Claim

      a.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that

1  could support the conclusion reached'" by the BPH. <u>Sass</u>, 461 F.3d at 1128 (quoting
2  <u>Superintendent v. Hill</u>, 472 U.S. at 455-56). The "some evidence standard is minimal, and
3  assures that 'the record is not so devoid of evidence that the findings of the . . . board were
4  without support or otherwise arbitrary.'" <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472
5  U.S. at 457). The some evidence standard of <u>Superintendent v. Hill</u> is clearly established law
6  in the parole context for purposes of § 2254(d). <u>Sass</u>, 461 F.3d at 1129. As a matter of state
7  law, the parole authority's decision must also satisfy the "some evidence" standard of review.
8  <u>See</u> <u>In re Lawrence</u>, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review
9  properly is characterized as whether 'some evidence' supports the conclusion that the inmate
10 is unsuitable for parole because he or she currently is dangerous").

11       Having determined that there is a due process right, and that some evidence is the
12 evidentiary standard for judicial review, the next step is to look to state law because that sets
13 the criteria to which the some evidence standard applies. One must look to state law to
14 answer the question, "'some evidence' of what?"

15       b.    <u>State Law Standards For Parole For Murderers In California</u>

16       California uses indeterminate sentences for most non-capital murderers, with the term
17 being life imprisonment and parole eligibility after a certain minimum number of years. A
18 first degree murder conviction yields a minimum term of 25 years to life and a second degree
19 murder conviction yields a minimum term of 15 years to life imprisonment. <u>See</u> <u>In re</u>
20 <u>Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190. The upshot of
21 California's parole scheme described below is that a release date normally must be set unless
22 various factors exist, but the "unless" qualifier is substantial.

23       A BPH panel meets with an inmate one year before the prisoner's minimum eligible
24 release date "and shall normally set a parole release date. . . . The release date shall be set in a
25 manner that will provide uniform terms for offenses of similar gravity and magnitude in
26 respect to their threat to the public, and that will comply with the sentencing rules that the
27 Judicial Council may issue and any sentencing information relevant to the setting of parole
28 release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the

1  panel "shall set a release date unless it determines that the gravity of the current convicted
2  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
3  is such that consideration of the public safety requires a more lengthy period of incarceration
4  for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.
5  Penal Code § 3041(b).

6  One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole
7  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A
8  parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A
9  parole date set under this article shall be set in a manner that provides uniform terms for
10 offenses of similar gravity and magnitude with respect to the threat to the public."[2]  The
11 regulation also provides that "[t]he panel shall first determine whether the life prisoner is
12 suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be
13 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
14 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
15 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.
16 Code Regs. § 2402(b).

17 The regulations contain a matrix of suggested base terms for several categories of
18 crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix
19 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
20 depending on some of the facts of the crime.  The statutory scheme places individual
21 suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to
22 ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is
23 not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal.
24 Code Regs. § 2403(a).

25 The "Penal Code and corresponding regulations establish that the fundamental
26 consideration in parole decisions is public safety . . . [T]he core determination of 'public
27 safety' under the statute and corresponding regulations involves an assessment of an inmate's
28 current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[3]

6

1      A critical issue in parole denial cases concerns the parole authority's use of evidence
2 about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts
3 for applying the Superintendent v. Hill some evidence standard on this point: Biggs v.
4 Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d
5 846 (9th Cir. 2007).[4]  Biggs explained that the value of the criminal offense fades over time
6 as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and
7 requires a careful balancing and assessment of the factors considered. . . .  A continued
8 reliance in the future on an unchanging factor, the circumstance of the offense and conduct
9 prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system
10 and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the
11 initial denial of a parole release date based solely on the nature of the crime and the
12 prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs
13 continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a
14 parole date simply because of the nature of Biggs' offense and prior conduct would raise
15 serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which
16 criticized the Biggs statements as improper and beyond the scope of the dispute before the
17 court:  "Under AEDPA it is not our function to speculate about how future parole hearings
18 could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not
19 precluded from relying on unchanging factors such as the circumstances of the commitment
20 offense or the petitioner's pre-offense behavior in determining parole suitability.  See id.
21 (commitment offenses in combination with prior offenses provided some evidence to support
22 denial of parole at subsequent parole consideration hearing).  Sass also put to rest any idea
23 from Biggs that the commitment crime and pre-offense behavior only support the initial
24 denial of parole.  Irons determined that due process was not violated by the use of the
25 commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into
26 his 17-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in
27 which the court had "held that a parole board's decision to deem a prisoner unsuitable for
28 parole solely on the basis of his commitment offense comports with due process, the decision

7

1    was made before the inmate had served the minimum number of years required by his
2    sentence." <u>Irons</u>, 505 F.3d at 853.  Interpreting this statement from <u>Irons</u> to suggest that the
3    offense can only be relied on until the minimum number of years has been reached would
4    suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the case.  The
5    dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole based
6    solely upon the commitment offense or pre-offense behavior violates due process.  Neither
7    logic nor <u>Irons</u> compels a decision that such reliance must cease when the prisoner reaches
8    the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life
9    sentence.

The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[5]

      c.    <u>Some Evidence Supports The BPH's Decision In Britt's Case</u>

          1.    <u>BPH Decision</u>

At the 2004 hearing, the BPH identified the circumstances of the commitment offense, Britt's escalating pattern of criminality, Britt's unstable social history, and Britt's failure to adequately engage in self-help programs as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to public safety.  In its decision, the BPH observed that Britt had numerous positive attributes, but the positive aspects of his

8

behavior did not outweigh factors of unsuitability. Resp. Exh. D, reporter's transcript of May 17, 2004 hearing ("5/17/04 RT") 58.

### a. Commitment Offense

On December 1, 1981, Britt shot and killed John Crahan, a 51-year old school teacher, in a failed attempt at kidnap-for-robbery. Britt and his associates had made a plan to wait for the victim at his home, handcuff him, and drive him to an orchard where they would demand money. When Britt and an associate, wearing masks and carrying .22 caliber firearms, approached the victim in an attempt to carry out the plot, the victim pulled out his own gun and began shooting at them. In response, Britt shot and killed the victim.

This was not a spontaneous event, but was the culmination of a lot of planning. See Resp. Exh. B, pp. 2-3. During November 1981, several teenagers (not including Britt) developed a plan to kidnap Crahan's elderly mother and hold her for ransom because they believed Crahan had money and drugs. They also had information that Crahan had sexually propositioned teenagers, which they threatened to use against him. Someone overheard one of the conversations and warned Crahan on three occasions of the kidnapping plot. Crahan made reports to the sheriff's department on two of these occasions, November 22 and November 28. Crahan even wrote a letter to one of the teenagers encouraging him not to get involved in the kidnapping plot. Crahan told a fellow teacher about the kidnapping plot, and looked more disturbed about it on November 31, 1981. The probation officer's report describes how Britt became involved:

> On November 31, 1981, 17 year old Jack Britt called Jonathan McIntyre [one of the teenagers plotting the kidnapping/robbery] and asked McIntyre if he knew where he could get some fast money. Court testimony revealed later that day, Mr. Britt was looking at an expensive car with Gary Cathcart and told Cathcart he was coming into some money pretty soon. Britt also told his girlfriend, Brenda Martin, about a kidnapping plot.
>
> On December 1, 1981, during the early morning hours, Jack Britt was picked up at his residence by Jonathan McIntyre and others. The four young men went to Stoney Hunt's residence that night where they discussed their plot. They planned to wait for Mr. Crahan at his residence that morning, handcuff him, and place him in his truck. McIntyre was to drive him to an orchard near Empire, as they didn't want any neighbors to see them with Mr. Crahan. While at the orchard, they would demand money from him. At some point, they decided to take guns, which Charles Earl provided, as they knew Mr. Crahan carried a gun.

9

> The four young men subsequently drove to an orchard near Empire, where they planned to take Mr. Crahan later that morning. At approximately 2:30 a.m., the four young men arrived near Mr. Crahan's residence. Stoney Hunt and Charles Earl remained in the car nearby, while Jonathan McIntyre and Jack Britt positioned themselves in front of Mr. Crahan's residence and waited. Later that morning, a neighbor of Mr. Crahan's came outside at which time the four young men left the area in the vehicle. Jonathan McIntyre and Jack Britt walked back to Mr. Crahan's residence, with Stoney Hunt and Charles Earl apparently waiting nearby. McIntyre located himself near the corner of the house while Britt positioned himself near Mr. Crahan's truck. Both of them had loaded .22 caliber handguns and were wearing masks. At approximately 6:00 a.m., Mr. Crahan exited his house and started to open the door of his truck. Britt told Crahan to, "Hold it right there," at which time Mr. Crahan started screaming something similar to, "No, no, they're here, they're here." Mr. Crahan pulled out a .22 caliber handgun and shot at Jonathan McIntyre and Jack Britt. McIntyre ran from the area through an alley while Jack Britt shot at Mr. Crahan.

Id. at 3-4. Britt shot Crahan in the upper chest. Crahan died that morning from the bullet wound.

In finding Britt unsuitable, the BPH stated: "This crime was carried out in an especially cruel and callous manner. The offense was carried out in a dispassionate – and it was a calculated manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for another human being. The motive for the crime is inexplicable." 5/17/04 RT 55.

### b. Increasing Criminality/Unstable Social History

Britt grew up in an unstable home. He stated that his father was an alcoholic who beat Britt and Britt's siblings. 5/17/04 RT 21. During his imprisonment, Britt had almost no contact with his family because, other than his mother (who passed away a few years before the hearing), everyone in his family disassociated themselves from him when he was arrested for the murder. 5/17/04 RT 23. Britt stated that he had experimented with drugs and alcohol before he was arrested. 5/17/04 RT 24.

Britt had a juvenile criminal record. When he was 15 or 16 years old, he pled guilty to a strong-armed robbery and was sent to forestry camp. 5/17/04 RT 26-27. While at forestry camp, he escaped, which was a misdemeanor and a violation of probation. Resp. Exh. B, Prob. Officer's Report, pp. 5-6.

### c. Self-Help

Britt had done no self-help work since his last parole suitability hearing. 5/17/04 RT

28. He "just stopped going" for "[n]o particular reason," 5/17/04 RT 29, or because he was busy with other activities, 5/17/04 RT 45-46.

The BPH was unimpressed by his lack of effort.  This was a reasonable view in light of the BPH's specific finding at the parole suitability hearing a year earlier that "the prisoner needs to continue to engage himself in any type of self-help programs, other meaningful activities that would help him be able to cope with stressful situations in a non-destructive manner.  Until the Board feels that enough progress has been made, the prisoner continues to be unpredictable and a threat to others." Resp. Exh. E at Exh. B, 1/6/03 RT 54.  Britt had received many disciplinary reports, although they were incurred many years earlier: he received "eight significant CDC-115 disciplinaries, seven of these disciplinaries were obtained within the first five years of his incarceration" and another one in 1998 for a "brief fist fight with another inmate." Resp. Exh. E at Exh. D (12/1/03 Psychological Evaluation), p. 3.

### 2. State Court Decision

The Stanislaus County Superior Court rejected Britt's habeas petition in a very short decision that stated the court's conclusions on his claims.  See Resp. Exh. E.  The California Court of Appeal and the California Supreme Court summarily rejected his petitions. See Resp. Exhs. F and G.

Where, as here, the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006);  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

### 3. Analysis Of Federal Claim

The BPH did not act arbitrarily or capriciously or without some evidentiary support in determining that Britt currently presented an unreasonable risk of danger to society if released from prison. Bearing in mind that the court's chore is to consider not whether some evidence supports the reasons, but whether some evidence supports the conclusion that Britt's release unreasonably endangers public safety, this court concludes that there was some evidence to support the BPH's conclusion.

The BPH considered circumstances and factors proper under California law. The BPH recognized that there was some commendable activity by Britt in prison. However, and notwithstanding all the positive factors for Britt, the BPH determined that, 23 years into his 17-to-life sentence, the murder plus his unstable social history and escalating criminality, plus his need for further self-help work showed that he posed an unreasonable risk of danger to society if released from prison.

The commitment offense was the major, but not only reason, for the BPH's decision. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The BPH's ultimate conclusion was cast in terms of the requirement of California law, i.e., that Britt was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." 5/17/04 RT 55; see Lawrence, 44 Cal. 4th at 1191. The criminal offense here was far worse than the typical second degree murder in that it involved a lot of planning and time for reflection in advance of the actual shooting. Britt had also been convicted of attempted kidnapping for robbery for his actions that day. Although Britt only joined in on the planning in the 48 hours preceding the killing, he did engage in some planning and had plenty of time to realize what he was doing before firing the deadly shot: Britt and the other teenagers discussed their plot the night before the killing, they drove to the orchard where they intended to take the victim, they drove to the victim's house in a car and left when a neighbor arrived, and then they returned on foot to lie in wait for the victim. Although he was not the ringleader of the kidnapping

1  plot, Britt was the person who fired the shot that killed the victim.  As soon as he saw them,
2  the victim apparently knew that which he had been dreading had arrived, as he screamed
3  "No, no, they're here, they're here."  Even though it had occurred 23 years earlier, the
4  advance planning to commit a kidnapping for money, the bringing of a gun for that purpose,
5  and the killing of a man trying to defend himself caused reasonable concern about Britt's
6  current dangerousness.   Further, Britt's other crime of a strong-arm robbery at age 15 or 16,
7  provided further cause for concern.  Britt had shown extraordinary violence at a rather young
8  age.  These factors, plus his choice not to engage in the self-help activities that the BPH had
9  specifically recommended, provided sufficient support for the BPH's conclusion that he
10 currently was not suitable for parole.  The Stanislaus County Superior Court's rejection of his
11 insufficient evidence claim was not contrary to or an unreasonable application of the
12 Superintendent v. Hill some evidence standard.  Britt is not entitled to the writ on this claim.

### 2. Breach of Plea Agreement Claim

14 Britt contends that the BPH's decision amounted to a breach of his plea agreement, in
15 violation of his right to due process.  He contends that, during plea negotiations, he "was led
16 to believe the Board determines parole suitability based on comparative offense gravity,
17 therefore by virtue of pleading guilty to Second Degree Murder (present[ed] to him as the
18 least serious murder type crime) he would be granted parole and released at the earliest date
19 suitable for his commitment offenses, absent committing crimes in prison." Petition, p. 9.

20 The claim is time-barred.  "A 1-year period of limitation shall apply to an application
21 for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."
22 28 U.S.C. § 2244(d)(1).  This statute applies to a habeas petition by a state prisoner
23 challenging a decision of an administrative body, such as the BPH, and the limitations period
24 starts to run from "the date on which the factual predicate of the claim or claims presented
25 could have been discovered through the exercise of due diligence. 28 U.S.C. §
26 2244(d)(1)(D); Shelby v. Bartlett, 391 F.3d 1061, 1066 (9th Cir. 2003); see also Redd v.
27 McGrath, 343 F.3d 1077, 1081-82 (9th Cir. 2003).  Here, the factual predicate or basis of
28 Britt's claim that his plea agreement was violated was known to him on or about July 21,

1993, when his minimum eligible parole date arrived and he was not paroled, or no later than 1999, when he had served 17 years (on his 17-to-life sentence) in custody and he was not paroled or given a parole date. Britt's breach of plea agreement thus accrued in 1993 or 1999, and he did not file this federal habeas petition within one year after either of those dates. He could not revive the time-barred claim by asserting that the agreement – which by his account was irrevocably breached in 1993 or 1999 or at any one of several parole hearings held before the 2004 hearing – was breached again in 2004, no more than one can revive a time-barred claim on a contract by demanding a new performance and alleging a new breach years after the contract has been irrevocably breached.

If the claim was not time-barred, it would fail on the merits. "Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), there is no evidence that Britt's subjective expectations about how parole would be decided were part of the plea agreement. The plea colloquy did not mention how parole consideration would occur, and Britt specifically agreed at the colloquy that, other than what had "been said here today," there was no other promise made as to the judgment or sentence the court would impose. Judicial Notice Motion (Docket # 9), Exh. B, 12/21/84 RT 7-8. Britt told the judge that he understood that the maximum he would be 17-to-life. Id. at 8. Britt provides no evidence that there was any promise that would be released at any particular time absent further criminal activity. His sentencing documents clearly reflect an indeterminate sentence of 15 years to life plus two years for the enhancement for a total of 17 years to life on the murder conviction. Resp. Exh. A. The possibility of parole does not mean a guarantee of parole; under state law (as it existed when he was sentenced and as it exists now), the inmate must be found suitable before his term and release date are set. Britt has received the parole considerations to which he was entitled under that agreement and sentence. Unlike the Brown petitioner, Britt does not identify any actual promise made to him or any particular

1  term of the agreement that has been breached.  By contrast, the Brown petitioner was able to
2  point to explicit statements in the plea colloquy that led her to believe she would get out in
3  half the minimum years if she behaved herself in prison.  See Brown, 337 F.3d at 1160
4  ("Brown heard and acknowledged the prosecutor's promises, and in the process of waiving
5  her right to trial she accepted them as part of her bargain.  'The intent of the parties becomes
6  clear upon an examination of the language of the plea agreement and the conduct of the
7  parties during the plea colloquy.")

8  Britt appears to argue that the BPH is precluded from considering his crime to involve
9  anything worse than the bare minimum elements of second degree murders.  The prosecutor
10 stated that Britt would plead "guilty to Count I, stipulated to be second degree murder, with
11 the use allegation."  Id. at 2.  Stipulating that the offense to which a defendant pleads guilty is
12 a second degree murder does not conclusively establish that the elements of first degree
13 murder do not exist.  Because of the way that criminal liability is determined – i.e., there
14 must be proof beyond a reasonable doubt of each of the elements of the offense – a guilty
15 plea (or a guilty verdict) on a charge of second degree murder conclusively establishes that
16 the elements of second degree murder are present but does not include any finding that the
17 greater offense's elements are absent.

18 The state court's rejection of the plea bargain claim was not contrary to, or an
19 unreasonable application of, clearly established Supreme Court authority.  Britt's claim that
20 his plea agreement was breached in violation of his right to due process fails.

21 B.     Case No. C 07-1121 - The Challenge To The 2005 Parole Denial

22 In Case No. C 07-1121, Britt challenges the decision of the BPH on December 12,
23 2005, finding him unsuitable for parole.  The transcript of the 2005 BPH hearing shows that
24 basically the same information was covered as in the 2004 proceeding, with a few
25 exceptions.  First, there was a more in-depth discussion of the commitment offense.
26 Although Britt elected not to discuss the offense at the 2004 hearing, he chose to discuss it at
27 the 2005 hearing.  At the 2005 hearing, Britt urged that he was under the impression that
28 Crahan (i.e., the victim) "was apprised of the situation when I became involved and was a

willing participant." 12/12/05 RT 20. Britt said he had been told that his associates were threatening to expose to the authorities that Crahan was having relationships with children, and that Crahan "was going to give them money to shut up." 12/12/05 RT 21. Britt claimed he was told to bring a weapon to make it "look like a real kidnapping attempt." 12/12/05 RT 21. The BPH commissioners did not believe his story: "nobody can really believe, you know, that you would arm yourself with a gun to go kidnap somebody who is already, you know, who is playing along with the game." 12/12/05 RT 58, 78-79. (At the 2004 hearing, Britt had not taken the position that he understood the victim was in on the plan; then, he had said that the victim "had all the right in the world to defend himself." 5/17/04 RT 43.)

Second, Britt had received a recent write-up on January 18, 2005 for attempting to steal something out of his central file. 12/12/05 RT 54. He received a CDC-128 counseling memorandum (rather than the more serious CDC-115 rule violation report) for attempting to steal microfiche with information regarding his commitment offense and two pictures from his central file when he was given an opportunity to look at the file. When a counselor caught him, he returned the materials to her, which explained why (according to Britt) he received a counseling memorandum rather than a rule violation report. 12/12/05 RT 48, 51. Although Britt denied that he had taken the microfiche and said that the pictures he took were his pictures, the memorandum recorded that he took both photographs and microfiche. 12/12/05 RT 48-49, 74. He knew he was not allowed to remove materials from his central file. 12/12/05 RT 88.

Third, the BPH was concerned about Britt's drug abuse history. See 12/12/05 RT 60-65, 68-69. Although Britt denied having done anything other than experimented with drugs three times before the murder, there was evidence in the file suggesting otherwise. There was a psychologist's report for the 2005 hearing that stated that he had a serious drug problem and should be in a drug treatment program if paroled. 12/12/05 RT 61-62. There also was an earlier psychological report in 2003 noting a polysubstance abuse in sustained, full remission. 12/12/05 RT 66. And he had received several CDC-115s early in his incarceration – about 17 years before the hearing – "for positive urinalysis, control of

16

marijuana, possession of marijuana, possession of drug paraphernalia, a has pipe, to include possession of a syringe with two needles."  12/12/05 RT 67.

The BPH identified several factors supporting its decision to find Britt unsuitable for parole at the 2005 hearing, i.e., the circumstances of the offense, Britt's unstable social history that included violence and drug use, and his prison behavior record (most notably the recent write-up for attempted stealing) as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to public safety.  The BPH relied on permissible factors and there was some evidence to support the BPH's reliance on those factors, notwithstanding Britt's generally favorable prison record.  Britt's argument that the BPH relied solely on the murder to deny him parole, see Petition, p. 11, is rejected as a misstatement of the BPH's decision.   Although the facts of the crime are immutable, they can continue to support the denial of the parole 23 actual years (in 2004) and 24 actual years (in 2005) into Britt's 17-to-life sentence.   Britt was yet another year removed from the crime in 2005, but he was further away from parole because of the recent stealing episode which undermined the idea that he had been rehabilitated or that his behavior could be characterized as exemplary in prison.

Since there is no reasoned state court decision concerning the 2005 decision, this court has conducted an independent review of the record, and concludes that the state court's rejection of the due process claim was not contrary to or an unreasonable  application of clearly established federal law as determined by the U.S. Supreme Court.  Britt is not entitled to the writ on this petition.

Britt argued in his traverse that an evidentiary hearing is necessary on this petition, but has identified no reason why such a hearing is necessary.  His insufficient evidence claim has been resolved by review of the BPH's decision and the evidence available to that decision-making body.

**CONCLUSION**

For the foregoing reasons, the petitions for writ of habeas corpus in Case No. C 06-2287 and in Case No. C 07-1121 are denied on the merits. The clerk shall close the files.

IT IS SO ORDERED.

DATED: March 16, 2010

Marilyn Hall Patel
United States District Judge

# NOTES

1.      Britt entered his guilty plea on December 21, 1984 and was sentenced on January 28, 1985.  However, he may have been in custody since his arrest on December 2, 1981.  See Resp. Exh. A and B.  The record is unclear on the point, but he may have had a trial, and pled guilty after some post-trial activity. The other participants had been convicted and sentenced before Britt was sentenced.

2.      The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

3.      The California Supreme Court's determination in Lawrence, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).  However, Lawrence does not govern this court's analysis in every respect.  This court is not bound by the discussion in Lawrence (see footnote 4, infra) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, Lawrence is persuasive authority, while the Ninth Circuit's holdings in Sass, Biggs, and Irons are binding authority. Also, Lawrence's determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

4.      En banc review is now pending in a fourth case regarding the some evidence standard, Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008).  The order granting en banc review states that the panel opinion is of no precedential value.

5.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of Lawrence, 44 Cal. 4th 1181, and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety."  Lawrence, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.